**UNITED STATES of America,**
**Appellee,**

v.

**Ivania Maria COUTO, also known as**
**Sealed dft # 35, Defendant–**
**Appellant.**

**Docket No. 01–1636.**

United States Court of Appeals,
Second Circuit.

Argued: Aug. 7, 2002.

Decided Nov. 15, 2002.

---

Mark M. Baker, (Benjamin Brafman, on the brief), Brafman & Ross, P.C., New York, NY, for Defendant–Appellant.

Barbara D. Cottrell, Assistant United States Attorney, for Joseph A. Pavone, United States Attorney for the Northern District of New York (Richard S. Hartunian, Assistant United States Attorney, on the brief), Albany, NY, for Appellee.

Before: CALABRESI, POOLER, and SACK, Circuit Judges.

CALABRESI, Circuit Judge.

Defendant Ivania Maria Couto appeals from a decision of the United States District Court for the Northern District of New York (McAvoy, *J.*) denying her motion to withdraw her plea of guilty to a charge of bribing a public official. On appeal, Defendant advances three reasons why she should have been allowed to withdraw the guilty plea: (1) that she had received ineffective assistance of counsel in violation of her Sixth Amendment rights and that, as a result, her plea was not knowing and voluntary; (2) that the district court abused its discretion in denying the motion since it based its decision solely on an unfounded assessment of the strength of the government's case; and (3) that, because deportation is now virtually certain for aliens convicted of aggravated felonies, the court was required under Fed.R.Crim.P. 11(c)(1) to inform Defendant of those deportation consequences before accepting her plea.

Concluding that Defendant did not receive the effective assistance of counsel and that the district court abused its discretion in denying Defendant's motion, we reverse the district court's decision. Because we reverse on those grounds, we need not decide the question of what effect, if any, recent changes to the Immigration and Nationality Act have on a court's obligation under Fed.R.Crim.P.

11(c)(1) to inform a defendant of the direct consequences of a guilty plea prior to accepting that plea.

## I.

Defendant came to the United States from Brazil in 1991 on a tourist visa. Soon afterwards, she gave birth to a son—who was born an American citizen—and she and the boy remained in this country after her tourist visa expired. A brief marriage to a U.S. citizen in 1994 was annulled, and a second marriage in 1995, also to a U.S. citizen, ended a year or so later when her husband died of cancer. Prior to the annulment of the first marriage, Defendant had filed an application with the INS for permanent resident status.

On June 16, 2000, as part of a multi-defendant, 34–count indictment, Defendant was charged with bribery and conspiracy to commit bribery of an INS official in violation of 18 U.S.C. §§ 201(b)(1)(A). Specifically, the government alleged that Defendant acted through an intermediary to secure a green card from an INS agent in return for $9,500.[1] Defendant retained a criminal defense attorney and pleaded not guilty.

Defendant asserts that in December 1999, she was approached by a man, Pedro Gonzalez, who spoke Spanish and claimed to be an attorney.[2] When she told him of her long-pending INS application, he offered to assist her in attaining permanent status. In March 2000, when she still had not heard from the INS, Defendant called Mr. Gonzalez and made an appointment to see him. Mr. Gonzalez told Defendant

that he could help her for "a little less than $10,000," and she agreed. Defendant steadfastly maintains that she believed she had validly retained an attorney to assist her. In May 2000, she met Mr. Gonzalez in Queens and rode with him to Albany for a meeting with an immigration official. According to Defendant, there were many other people (who Mr. Gonzalez said were clients) on the trip. Because these people spoke mostly Spanish, Defendant had difficulty communicating with them.

Defendant says that upon arriving at a restaurant in Albany, she gave Mr. Gonzalez $5,000. She then went to a motel with the others and met the INS official. Mr. Gonzalez told her that she should pay him the remainder of the fee when she received the proper documentation from the INS. After she had spoken "with various people as best as [she] could because they spoke either Spanish or English," Defendant's passport was stamped and returned to her. She then went back to New York City with the others, expecting to hear from Mr. Gonzalez. Instead, in June 2000, Defendant was arrested. As it turned out, the INS official Defendant had met at the hotel was "an undercover INS agent posing as a 'corrupt' INS official." Moreover, Mr. Gonzalez, who was also indicted, was not an attorney at all.

Defendant was referred to a criminal defense attorney, Arnold Proskin, who met with her in the Albany County Jail for about 15 minutes on July 10, 2000. She was granted bail following her arraignment on July 19, whereupon she learned that she was also subject to INS removal proceedings and was being held in jail by

---

**1.** Although other defendants in the indictment were charged with exchanging drugs for green cards, and although the indictment erroneously listed Defendant's charges as involving heroin, the prosecutor, judge, and defense attorney all clarified at the arraignment and in subsequent proceedings that Defendant had no involvement with, or awareness of, any drugs.

**2.** Defendant, whose first language is Portuguese, can communicate, with some difficulty, in Spanish and in English.

that agency as well. Mr. Proskin arranged for her to be released on bond from the INS the same day. Mr. Proskin told her that the INS was "closing out her earlier case and that her application had been cancelled." He added that he had no objection to the INS doing this, and Defendant asserts that she relied on his advice. Mr. Proskin told her that he was not an immigration lawyer, but that he would consult with one, and she should give him money both for his services and those of the immigration lawyer. Defendant paid Mr. Proskin accordingly, and returned home.

Defendant says that she did not hear from Mr. Proskin again until she received a letter from him in early November 2000, around the time that she also got a letter from the INS informing her that a hearing concerning her removal had been scheduled for April 10, 2001.[3] Mr. Proskin's letter told her that a trial date had been set for December 4, 2000, and that he had received from the U.S. Attorney "a videotape of communications [Defendant] had with the undercover agent." Defendant maintains that she did not understand the reference to an "undercover agent" and tried to call Mr. Proskin, but that she was unable to reach him. Defendant received a copy of the tape on November 22, and called Mr. Proskin to insist on a meeting with him. This was scheduled for November 30.

At the meeting, Mr. Proskin told Defendant that he had arranged a plea agreement with the government, that a court date had been set for the next day, and that she had to decide by the following morning whether to plead guilty. Defendant contends that her attorney told her that if she did not plead guilty she would probably be found guilty and go to jail, but predicted she could avoid jail by pleading

guilty. Moreover, he assured her that they could deal with her immigration problem after the guilty plea, and said there were many things that could be done to prevent her from being deported, including asking the judge for a letter recommending against deportation.

The following day, Defendant accepted the government's offer to plead guilty to one count of the indictment. Since the judge was in Syracuse and the Defendant and prosecutor were in Albany, the plea hearing was conducted by teleconference, the Defendant, through her attorney, having waived her right to a face-to-face hearing. She also waived her right to an interpreter. At one point in the hearing, Defendant hesitated when asked if the Government's statement of the case was correct, but her attorney explained that her hesitation was because she had originally believed Mr. Gonzalez was a legitimate attorney and had discovered "at some point later on" that he was not. The judge confirmed that Defendant had spoken with her attorney about the plea agreement, about the consequences of pleading guilty, and about her chances at trial. The judge advised her as to the rights she waived by pleading guilty, and confirmed that she was satisfied with what her lawyer had done for her thus far and that she signed the plea agreement voluntarily. Finally, the judge explained the sentencing guidelines to the defendant, and informed her that, under those guidelines, the maximum penalty for the count involved would be 15 years' imprisonment, three years' supervised release, a $250,000 fine and a $100 special assessment.

Throughout the hearing, no mention was made of any possible deportation. More specifically, no one informed Defendant that, because the 1996 amendments to the

---

**3.** This removal proceeding was subsequently rescheduled for October 2, 2001.

Immigration and Nationality Act eliminated all discretion as to deportation of noncitizens convicted of aggravated felonies, her plea of guilty meant virtually automatic, unavoidable deportation.[4] Defendant pleaded guilty and sentencing was set for April 13, 2001.

On April 3, sentencing was adjourned to September, and in late July, Defendant obtained new counsel and moved to withdraw her guilty plea. In that motion, she asserted (1) that "as a direct result of her conviction for an 'aggravated felony,' Defendant now faces certain deportation, which U.S. Immigration Court proceeding is scheduled for October 2, 2001"; (2) that because deportation is now a direct consequence for such a conviction, the district court judge was required, under Fed. R.Crim.P. 11, to inform her of that consequence prior to accepting the plea; and (3) that because Defendant's attorney not only failed to advise her that deportation was a certain consequence of her plea, but affirmatively misrepresented to her that the judge could issue a recommendation against deportation, she was denied the effective assistance of counsel. The district court ordered an evidentiary hearing on Defendant's motion.

Both Defendant and her original criminal defense attorney testified at the hearing. Mr. Proskin had little recollection of his representation of Ms. Couto. He acknowledged that he received the plea agreement from the U.S. Attorney's office "early on" but did not remember when he went over the agreement with his client, or when he provided the videotape to her. Mr. Proskin said he told Ms. Couto that he had no expertise in immigration law, but that he would help her get an immigration lawyer. Initially, he said he did not recall accepting money from Defendant for the purpose of hiring an immigration lawyer, but later acknowledged that he had. Mr. Proskin consistently and repeatedly claimed that he told Defendant she should get the criminal matter out of the way first, and that "we'll get an immigration lawyer to handle the immigration matter subsequent to this."

Defendant testified that on the day of her bail hearing, she gave Mr. Proskin money to hire an immigration attorney; that she did not see Mr. Proskin again until November 30; and that he did not send her the videotape until four days before he met with her at the end of November. She added that Mr. Proskin did not ask her to explain her actions on the videotape, never watched the tape with her, and did not ask her to talk to any investigator or paralegal in his office about the tape. Mr. Proskin also failed to ask her to give him information about Mr. Gonzalez, or about how she got involved in the actions that led to her arrest.

Defendant further testified that Mr. Proskin told her there were a lot of things that could be done to avoid deportation, that he would ask the judge for a letter recommending against deportation, and that she should not worry about it. She said at the hearing that, even though she understood that a trial conviction might result in jail, she would not have entered a plea of guilty if she had known that such a plea would lead to automatic deportation.

The district court denied Defendant's motion on November 9, 2001. *United States v. Couto*, 178 F.Supp.2d 169 (N.D.N.Y.2001). It reasoned (1) that Rule 11 does not require the court to advise a

---

4. The INS has interpreted the charge to which Defendant pleaded guilty, bribery of a public official, as falling within 8 U.S.C. § 1101(a)(43)'s definition of "aggravated felony." *See United States v. Ko*, 1999 WL 1216730 *2 (S.D.N.Y. Dec.20, 1999). The parties in this appeal do not dispute that interpretation.

defendant of the immigration consequences of her guilty plea; (2) that an attorney's failure to inform a defendant of these consequences does not constitute ineffective assistance of counsel; and (3) that, because the court was obligated to draw all inferences in favor of the government, it must assume that the videotape and the INS agent's testimony would help the prosecution make out the elements of the crime charged, and, therefore, allowing the withdrawal would be futile. The court sentenced Defendant to five years' probation and a $2,500 fine. This timely appeal followed.

## II.

### A. Court's Discretion to Allow Withdrawal of Pleas

■■■ Pursuant to the currently applicable Fed.R.Crim.P. 32(e),[5] a district court may permit withdrawal of a guilty plea prior to sentencing if there are valid grounds for withdrawal and if granting the motion would be fair and just, giving due regard to any prejudice the government might suffer as a result. *United States v. Maher*, 108 F.3d 1513, 1529 (2d Cir.1997). While "this standard implies that motions to withdraw prior to sentence should be liberally granted, a defendant who seeks to withdraw his plea bears the burden of satisfying the trial judge that there are valid grounds for withdrawal." *United States v. Gonzalez*, 970 F.2d 1095, 1100 (2d Cir.1992) (quotation marks and citations omitted). A district court's denial of a motion to withdraw a plea of guilty is reviewed for abuse of discretion. *Maher*, 108 F.3d at 1529. "A district court abuses its discretion if it bases its ruling on a mistaken application of the law or a clearly erroneous finding of fact." *Milanese v. Rust-Oleum Corp.*, 244 F.3d 104, 110 (2d Cir.2001).

■■■ In denying Defendant's motion to withdraw her guilty plea, the district court erred in its analysis of whether a "fair and just" reason to allow the withdrawal existed. At the outset, the court correctly noted that the factors to be considered include 1) the amount of time between the plea and the motion to withdraw, 2) whether the defendant is now asserting her legal innocence, and 3) the prejudice, if any, to the government. The court concluded that there was, in fact, no delay in filing the motion, and no evidence that the government would be prejudiced by the withdrawal. In evaluating Defendant's claim of innocence, however, the district court felt constrained to assume that the videotape of communications between Defendant and the undercover agent[6] "could make out the elements of the crime for the government," and that "that government is likely to call the INS agents as witnesses, further solidifying their case against Defendant." 178 F.Supp.2d at 175. In explaining these assumptions, the court asserted three times, without citation, that it was required to "draw all inferences in favor of the government." *Id.* at 172, 175.

In this assertion, the district court appears to have been relying on *United States v. Maher*. *Maher*, however, involved circumstances vastly different from those presented here. In *Maher*, the defendants, "after two weeks of trial at which the government had presented evidence ... through the testimony of 25 of its 26

---

**5.** The 2002 Amendments to the Federal Rules of Criminal Procedure, slated to take effect on December 1, 2002, address a defendant's ability to withdraw a guilty plea in Rule 11(d)-(e). *See* United States Supreme Court Order 02–

18, Amendments to Rules 1 Through 60 (Apr. 29, 2002).

**6.** The record does not indicate that the court had seen the tape.

scheduled witnesses," entered an agreement with prosecutors to change their plea to guilty. *Maher*, 108 F.3d at 1519. At their plea allocution, the defendants made several very specific admissions which contradicted the assertions they subsequently made in their motion to withdraw the guilty pleas. *Id.* at 1530. In considering that motion, the court noted that

> [t]he self-inculpatory statements he made under oath at his plea allocution carry a strong presumption of verity, and the court, in reviewing the belated claims of innocence, must draw all permissible inferences in favor of the government and against the defendant, especially when, as here, the defendant has gone to trial, heard most of the government's evidence, and then pleaded guilty, describing his wrongdoing and acknowledging that he could not effectively defend against that evidence.

The defendants here have not met their burden, for the district court was, in all the circumstances, entitled to reject the newly advanced innocent explanation for their behavior and to credit instead the evidence that had been presented at trial and in the defendants' own earlier descriptions of their conduct. *Id.* (quotation marks and citations omitted).

The instant case is readily distinguishable. First, at the plea allocution, Defendant made no specific admissions beyond her statement "yes, that's what happened,"—a statement which was itself somewhat questionable given her hesitation and difficulty with English. Second and more important, the district court here did not, as the *Maher* trial court had done, simply consider and credit the evidence that the prosecutor had *actually presented.* Rather, the trial court in this case made broad assumptions about the evidence the prosecutors *might* present and the possible strength of that evidence.

For example, the court said that "the government is likely to call the INS agents as witnesses, thus solidifying their case against Defendant." 178 F.Supp.2d at 175. But since the INS agents had neither provided affidavits, nor been cross-examined by the defense or questioned by the court, there was no reasonable basis from which to infer that the agents' testimony would strengthen, rather than weaken, the government's case.[7] Certainly *Maher* does not cover such a situation and is more appropriately viewed as concerned only with specific statements made at the plea allocution and evidence presented to the court. It is with respect to those statements and evidence that *Maher* requires that inferences be drawn in the government's favor. *See, e.g., United States v. Yarmoluk*, 993 F.Supp. 206, 209 n. 2 (S.D.N.Y.1998), *aff'd* 172 F.3d 39 (2d Cir. 1999) (noting that "[s]elf-serving speculations, hearsay, and other inadmissible evidence in the [defendants'] affidavits must be disregarded. In addition, the affidavits should be construed, if anything, favorably to the Government" (citing *Maher* )).

Because the district court erred in believing that it was obligated to make inferences crediting whatever evidence it thought the government might present at a subsequent trial, the court misunderstood the broad discretion afforded it by Rule 32(e). At a minimum, then, the court's order denying Defendant's motion to withdraw should be vacated and remanded to that court. As explained below,

---

7. Thus, the agents might well have testified that Defendant seemed to know exactly what was going on, but they might just as well have recalled that, amidst numerous people in the motel room speaking different languages, Defendant appeared confused or uncertain as to what was happening.

however, additional facts in the record allow us to go further and determine that the motion to withdraw should have been granted.

## B. Ineffective Assistance of Counsel

 Ineffective assistance of counsel "may render a guilty plea involuntary, and hence invalid." *Ventura v. Meachum,* 957 F.2d 1048, 1058 (2d Cir.1992). An "accused who has not received reasonably effective assistance from counsel in deciding to plead guilty cannot be bound by that plea because a plea of guilty is valid only if made intelligently and voluntarily." *United States v. George,* 869 F.2d 333, 335–36 (7th Cir.1989); *Downs–Morgan v. United States,* 765 F.2d 1534, 1538 (11th Cir. 1985).[8]

 We evaluate Defendant's claim that her guilty plea was involuntary or unknowing due to ineffective assistance of counsel using the framework established in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). *United States v. Hernandez,* 242 F.3d 110, 112 (2d Cir.2001) (per curiam) (citing *Hill v. Lockhart,* 474 U.S. 52, 57–58, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985)). A defendant must first establish that "counsel's representation fell below an objective standard of reasonableness." *Hernandez,* 242 F.3d at 112 (quoting *Hill,* 474 U.S. at 57–58, 106 S.Ct. 366). Second, "the defendant must show that there is a reasonable probability that, but for counsel's errors, [the defendant] would not have pleaded guilty and would have insisted on going to trial." *Id.* (quoting *Hill,* 474 U.S. at 59, 106 S.Ct. 366). "The question of whether a defendant's lawyer's representation violates the Sixth Amendment right to effective assis-

tance of counsel is a mixed question of law and fact that is reviewed de novo." *Id.*

 Although the district court found that Defendant's counsel affirmatively misled Defendant into believing there were things that could be done to avoid deportation (when in fact there were none), the court concluded that "[t]his erroneous advice is not . . . enough to allow the withdrawal of the plea." 178 F.Supp.2d at 173. The court erred in this conclusion.

We have held that an attorney's failure to inform a client of the deportation consequences of a guilty plea, without more, does not fall below an objective standard of reasonableness. *See, e.g., United States v. Santelises (Santelises II ),* 509 F.2d 703, 704 (2d Cir.1975) (per curiam) (noting that attorney's failure to inform a defendant that a guilty plea could result in deportation "is of no legal significance"). At the same time, we have implied that an attorney's *affirmative misrepresentations* on the subject might well constitute ineffective assistance. *See, e.g., id.* ("Since [the attorney] does not aver that he made an affirmative misrepresentation, [the defendant] fails to state a claim for ineffective assistance of counsel."); *United States v. Santelises (Santelises I ),* 476 F.2d 787, 789–90 (2d Cir.1973) (no ineffective assistance claim where the defendant "does not allege that he was affirmatively misled by his counsel"). And on some occasions, we have suggested that an attorney does have a duty to provide that information. *See Michel v. United States,* 507 F.2d 461, 465 (2d Cir.1974) ("Where his client is an alien, counsel and not the court *has the obligation* of advising him of his particular position as a consequence of his plea." (emphasis added)). Moreover, recent Supreme Court authority supports this

---

8. And, of course, even the trial court's compliance with Fed.R.Crim.P. 11 does not guarantee that the guilty plea is constitutionally valid. *See Fontaine v. United States,* 411 U.S. 213, 93 S.Ct. 1461, 36 L.Ed.2d 169 (1973) (per curiam).

broader view of attorney responsibility as well. *See, e.g., INS v. St. Cyr,* 533 U.S. 289, 323 n. 50, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001) ("Even if the defendant were not initially aware of [possible waiver of deportation under the Immigration and Nationality Act's prior] § 212(c), *competent defense counsel,* following the advice of numerous practice guides, would have advised him concerning the provision's importance." (emphasis added) (citing Amicus Br. For Nat'l Assoc. Criminal Defense Lawyers et al. at 6–8)); *id.* at 322 n. 48, 121 S.Ct. 2271 (noting that "the American Bar Association's Standards for Criminal Justice provide that, if a defendant will face deportation as a result of a conviction, defense counsel 'should fully advise the defendant of these consequences' " (citing ABA Standards for Criminal Justice, 14–3.2 Comment, 75 (2d ed.1982))).

■ Because in the instant case Defendant was affirmatively misled by her attorney, we need not, however, reconsider whether the standards of attorney competence have evolved to the point that a failure to inform a defendant of the deportation consequences of a plea would by itself now be objectively unreasonable. We believe that an affirmative misrepresentation by counsel as to the deportation consequences of a guilty plea is today objectively unreasonable. We therefore hold that such a misrepresentation meets the first prong of the *Strickland* test. It follows that if the defendant can also establish that "there is a reasonable probability that, but for counsel's errors, [s]he would not have pleaded guilty and would have insisted on going to trial," *Hernandez,* 242 F.3d at 112, then, the guilty plea is invalid.

The facts of the current case demonstrate that probability beyond peradventure.[9]

## C. Deportation as a Direct Consequence of Guilty Plea

Finally, Defendant argues that, because the 1990 and 1996 Amendments to the Immigration and Nationality Act make deportation a virtually certain consequence for an alien convicted of an aggravated felony, the district court's failure, before accepting her guilty plea, to inform her of that consequence violates Fed.R.Crim.P. 11(c)(1).

■ This Circuit "has adopted a standard of strict adherence to Rule 11," *United States v. Livorsi,* 180 F.3d 76, 78 (2d Cir.1999) (quoting *United States v. Lora,* 895 F.2d 878, 880 (2d Cir.1990), and we therefore "examine critically even slight procedural deficiencies to ensure that the defendant's guilty plea was a voluntary and intelligent choice, and that none of the defendant's substantial rights ha[s] been compromised.)' " *Livorsi,* 180 F.3d at 78 (quoting *Maher,* 108 F.3d at 1520) (alteration in original).

■ Rule 11(c) requires that, before accepting a plea of guilty or nolo contendere, the district court "address the defendant personally in open court" and inform her of "the nature of the charge to which the plea is offered, the mandatory minimum penalty provided by law, if any, and the maximum possible penalty provided by law" as well as ensure that the defendant understands the applicable sentencing guidelines. Fed.R.Crim.P. 11(c)(1). This does not mean, however, that the district court must anticipate and warn the defendant of "every conceivable

---

9. Defendant's whole behavior—including her alleged crime—was designed to avoid deportation. And as soon as she learned the deportation consequences of her plea, she immediately sought to withdraw it. Under the circumstances, there can be no doubt that the likelihood of a guilty plea would have greatly diminished had counsel not misled her.

collateral effect the conviction entered on the plea might have." *Bye v. United States*, 435 F.2d 177, 179 (2d Cir.1970). Rather, "[t]he purpose of Rule 11 was to insure that an accused is apprised of the *significant* effects of his plea so that his decision to plead guilty and waive his right to trial is an informed one." *Id.* at 180 (emphasis added).

Years ago, we concluded that the possibility of deportation based on a conviction was a "collateral consequence" of a guilty plea, and that the court was not required to inform the defendant of such a possible consequence. *See, e.g., United States v. Parrino*, 212 F.2d 919, 921 (2d Cir.1954); *Santelises I*, 476 F.2d at 789 ("[T]he mere failure of a district judge to warn a defendant of the possibility of deportation as a consequence of his plea does not, without more, amount to a violation of constitutional due process, thereby rendering the plea invalid."); *Michel*, 507 F.2d at 465.

Defendant points out, however, that at the time those cases were decided, decisions about deportation were within the broad discretion of the Immigration and Naturalization Service. The *Parrino* court, for example, noted that "deportability is determined by the Immigration and Nationality Act of 1952." 212 F.2d at 922. The court further explicitly recognized that one section of that Act "provides for suspension of deportation at the discretion of the Attorney General" for certain aliens. *Id.* at 922 n. 7. Similarly, the *Santelises* court, in its analysis, relied on the non-automatic nature of the deportation laws then in effect:

> Moreover, we should emphasize that deportation ... is not "automatic." ... [D]eportation results ... only upon "an order of the Attorney General" who retains discretion whether or not to institute such proceedings. Deportation then, serious sanction though it may be,

*is not such an absolute consequence* of conviction that we are mandated to read into traditional notions of due process a requirement that a district judge must warn each defendant of the possibility of deportation before accepting his plea. *Santelises I*, 476 F.2d at 790 (emphasis added).

Moreover, prior to 1990, a trial judge had the authority to issue a judicial recommendation against deportation ("JRAD") under then 8 U.S.C. § 1251(b). Such a recommendation was "binding on the Attorney General," and § 1251(b) therefore gave the judge "conclusive authority to decide whether a particular conviction should be disregarded as a basis for deportation." *Janvier v. United States*, 793 F.2d 449, 452 (2d. Cir.1986). As part of the Immigration Act of 1990, Pub.L. No. 101–649, § 505, 104 Stat. 4978, 5050 (1990), Congress amended former 8 U.S.C. § 1251(b), to eliminate the "safety valve" of the JRAD. After the effective date of the 1990 Act, then, the only barrier to deportation for an alien convicted of an aggravated felony was a waiver by the United States Attorney General. But this degree of discretion, too, did not long survive.

Thus, the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub.L. No. 104–132, 110 Stat. 1214, and the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub.L. No. 104–208, 110 Stat. 3009–546, further amended the Immigration and Nationality Act to eliminate the Attorney General's authority to grant a waiver to deportation. As a result, "[n]o alien described in this section shall be eligible for any relief from removal that the Attorney General may grant in the Attorney General's discretion." 8 U.S.C. § 1228(b)(5).

Given these amendments, an alien convicted of an aggravated felony is automati-

cally subject to removal and no one—not the judge, the INS, nor even the United States Attorney General—has any discretion to stop the deportation. Therefore, Defendant argues, the rationale behind the decisions in *Parrino* and *Santelises*—that deportation is not a direct consequence *because it is not automatic*—no longer reflects the state of the law. Instead, deportation today is an essentially certain, automatic, and unavoidable consequence of an alien's conviction for an aggravated felony.

Under these circumstances, Defendant maintains, this Circuit's pronouncement that the purpose of Rule 11 is "to insure that an accused is apprised of the significant effects of his plea so that his decision to plead guilty and waive his right to a trial is an informed one," *Bye,* 435 F.2d at 180, takes on renewed significance. Certain and automatic deportation, she argues, is, without doubt, a "significant effect[ ]" of which the accused should be apprised.[10] And, Defendant concludes,

Rule 11 must now be read to require that the court ascertain, before accepting a plea, that the defendant is aware of this virtually certain, and unquestionably significant, consequence of a guilty plea.

On its face, Defendant's argument is persuasive, and we believe that it deserves careful consideration, even though three other circuits—the First, Sixth, and Ninth—have declined to reconsider their prior holdings on this point. *See El–Nobani v. United States,* 287 F.3d 417, 421 (6th Cir.2002), *cert. denied,* 2002 WL 31359017 (U.S. Nov.12, 2002); *United States v. Amador–Leal,* 276 F.3d 511, 516–17 (9th Cir.2002), *cert. denied,* —— U.S. ——, 122 S.Ct. 1946, 152 L.Ed.2d 849 (2002); *United States v. Gonzalez,* 202 F.3d 20, 28 (1st Cir.2000). At the least, it would seem an appropriate factor to guide the district courts' discretion in considering a defendant's attempt to withdraw a guilty plea. Nevertheless, because the circumstances of this case allow its resolution without

---

**10.** Our decision in *Michel* did not rely on the non-automatic nature of deportation. Rather, the *Michel* panel distinguished "direct" from "collateral" consequences. *Michel* seemed to say that what mattered was not the likelihood of an event occurring as a result of a guilty plea, but whether it was the court accepting the plea or another institution that made the decision that would bring about the event in question. *See* 507 F.2d at 465–66. Still, although the *Michel* panel expressed disapproval of determining "directness" of a consequence based on the likelihood of its occurrence, "virtual certainty" is another matter. Thus, when an event is a certain consequence of a decision by a court, it is meaningless to say that the court did not ordain that event; any action by other institutions are purely ministerial. As a result, *Michel*'s rationale might itself not survive the changes to the immigration law.

In this respect, the *Michel* panel's reliance on *Bye* is a further indication that a truly certain consequence might be "direct" even if the entity nominally responsible for the consequence is not the court itself. In *Bye,* the

panel held that a guilty plea is not "voluntary" when it is given by an accused who does not know that he will be ineligible for parole from the sentence he receives. 435 F.2d at 178. The panel reasoned, in language the *Michel* panel quoted approvingly, that "the unavailability of parole directly affects the length of time the accused will have to serve in prison," and that "such a major effect on the length of possible incarceration would have great importance to an accused in considering whether to plead guilty." *Bye,* 435 F.2d at 180 (quoted in *Michel,* 507 F.2d at 463). And the *Bye* panel rejected a distinction based on the origin of the consequence:

It is therefore of no moment that parole generally can be characterized as a legislative grace, and that ineligibility of parole for narcotics offenders could be classified as the withholding of a legislative grace. Rule 11 is not concerned with the legislative genesis of the eligibility for parole, but with the extent to which ineligibility for parole could influence an accused's decision whether to plead guilty. *Id.* (internal citation omitted).

taking up this difficult question, we need not, and hence do not, address it further.

### III.

The district court misunderstood the broad discretion afforded it by Rule 32(e), and erred in crediting possible evidence it thought the government might present at a subsequent trial. By itself, that error would require that the decision be vacated and remanded to that court. Because, however, the record before us clearly establishes (1) that Defendant's attorney's affirmative misrepresentation about the deportation consequences of her guilty plea fell below an objective standard of reasonableness, and (2) that Defendant's overriding concern is remaining in the United States and hence that she very likely would not have pleaded guilty if she had understood the deportation consequences of that plea, we hold that Defendant's plea was rendered involuntary by her counsel's ineffective assistance and we therefore REVERSE the district court's order denying Defendant's motion to withdraw her guilty plea, VACATE her conviction and her guilty plea, and REMAND for further proceedings consistent with this opinion.