ROBERT GRANT *v.* COMMISSIONER OF
CORRECTION
(AC 24354)

Lavery, C. J., and Schaller and Dupont, Js.

Argued September 22—officially released December 14, 2004

*Charles F. Willson*, special public defender, for the appellant (petitioner).

*Jessica Probolus*, special deputy assistant state's attorney, with whom, on the brief, were *James E. Thomas*, state's attorney, and *Michael A. Gailor*, assistant state's attorney, for the appellee (respondent).

SCHALLER, J. The petitioner, Robert Grant, appeals from the judgment of the habeas court denying his amended petition for a writ of habeas corpus. On appeal, the petitioner claims that the court improperly concluded that he received the effective assistance of counsel. We affirm the judgment of the habeas court.

On November 13, 1989, a jury acquitted the petitioner of the charge of conspiracy to commit murder and convicted him of the charge of accessory to murder. On January 11, 1990, the court sentenced the petitioner to a term of twenty-five years incarceration. The petitioner's conviction was affirmed on direct appeal. See *State* v. *Grant*, 219 Conn. 596, 594 A.2d 459 (1991).

Our Supreme Court stated that the jury reasonably could have found the following facts. "Two witnesses for the state, Robert Gordon and Marc Osborne, testified about the events that occurred immediately prior and subsequent to the shooting [of the victim, Marcel Malcolm]. Gordon testified that the victim was involved in the selling of cocaine and that an association existed between the victim and Ronald Daniels, whereby Daniels would sell drugs for the victim. Disagreements had arisen over $400 that Daniels owed to the victim. Between 5 and 6 p.m. on March 19, 1988, Daniels called Gordon, who, at the time, was living in Daniels' house with Daniels' family, and asked him to take the victim to a certain location at Lyme Street. When the victim appeared at Daniels' house, he and Gordon drove to Lyme Street in the victim's white Nissan automobile.

"Osborne testified that at approximately 5:45 p.m. on March 19, 1988, he received a telephone call at his home from Daniels, requesting the use of Osborne's shotgun. When Osborne asked Daniels why he wanted the shotgun, Daniels responded that he 'wanted to scare someone.' Between approximately 6:45 and 7 p.m., Daniels

arrived at Osborne's house and took the shotgun and three shells. Daniels put the shotgun down his sweatpants and zipped up his jacket and then he and Osborne left the house and proceeded on foot west on Tower Avenue toward its intersection with Palm Street. Before they reached Palm Street, a man, later identified as the [petitioner], drove up in a dark colored Mazda automobile and Daniels 'flagged it down.' Osborne got in the back seat and Daniels got in the passenger seat. Once in the car, there was some whispered conversation between the [petitioner] and Daniels, but nothing that Osborne could hear.

"Without any instructions from Daniels, the [petitioner] proceeded west down Tower Avenue, took a right onto Palm Street going north and another left onto Harold Street. About halfway between Palm and Lyme Streets, Daniels told the [petitioner] to pull over, and Daniels and Osborne got out of the defendant's automobile. The [petitioner] then proceeded west down Harold Street and made a right onto Lyme Street. Daniels and Osborne continued to walk down Harold Street until they reached the intersection of Lyme Street, where they waited until the white Nissan driven by the victim pulled up and parked.

"After the victim arrived and parked his car, Gordon, who was in the passenger seat, got out and walked over to Daniels, who had proceeded to the driver's side of the vehicle. An argument developed between the victim and Daniels, after which Daniels pulled the shotgun out of his sweatpants, told the victim he had five seconds and proceeded to count backwards from five. After the countdown, Daniels fired three shots into the victim. Within seconds of the shooting, the [petitioner's] dark colored Mazda automobile reappeared and pulled up next to the victim's car. After the [petitioner] gave certain instructions to Daniels, all three men, Daniels, Gor-

don and Osborne, got into the [petitioner's] automobile and drove away from the scene." Id., 597–99.

After filing four habeas petitions following his conviction and direct appeal, the petitioner filed a motion to consolidate the petitions and requested permission to file a consolidated amended petition, which the court granted. On June 13, 2002, the petitioner filed an amended petition that alleged that the performance of his trial counsel, attorney Donald Freeman, was ineffective in several ways. Specifically, the petitioner claimed, inter alia, that Freeman failed (1) to conduct an adequate investigation, (2) to cross-examine the state's witnesses effectively, (3) to discuss the defense strategy with the petitioner, (4) to discuss with the petitioner his right to testify and to call him as a witness (5) to present relevant testimony of witnesses in support of his defense, (6) to request that the court recommend against deportation of the petitioner and (7) to object to certain prosecutorial conduct.[1]

On April 25, 2003, the court issued its memorandum of decision denying the petition. It found that Freeman made several sound tactical decisions regarding the defense strategy. The court concluded that the petitioner failed to satisfy the two-pronged test set forth in the United States Supreme Court decision in *Strickland* v. *Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). The court granted the petition for certification to appeal on May 9, 2003. Additional facts will be set forth as necessary.

The petitioner limits his appeal to two instances of claimed ineffective assistance of counsel: First, Freeman's failure to call Daniels as a witness, and, second,

---

[1] In the second count of his amended petition, the petitioner argued that the prosecutor committed misconduct. In the third count, the petitioner alleged that appellate counsel was ineffective. The petitioner has not appealed from the court's judgment with respect to these two counts.

Freeman's failure to request a judicial recommendation against deportation. We address each in turn.

I

The petitioner first claims that the court improperly concluded that he received effective assistance of counsel despite Freeman's failure to call Daniels, the individual who shot the victim, as a witness in the criminal trial. We disagree.

"Our standard of review of a habeas court's judgment on ineffective assistance of counsel claims is well settled. In a habeas appeal, this court cannot disturb the underlying facts found by the habeas court unless they are clearly erroneous, but our review of whether the facts as found by the habeas court constituted a violation of the petitioner's constitutional right to effective assistance of counsel is plenary. . . . A criminal defendant is constitutionally entitled to adequate and effective assistance of counsel . . . . In *Strickland* v. *Washington*, [supra, 466 U.S. 687], the United States Supreme Court established that for a petitioner to prevail on a claim of ineffective assistance of counsel, he must show that counsel's assistance was so defective as to require reversal of [the] conviction . . . . That requires the petitioner to show (1) that counsel's performance was deficient and (2) that the deficient performance prejudiced the defense. . . . Unless a [petitioner] makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable. . . .

"The first component of the *Strickland* test, generally referred to as the performance prong, requires that the petitioner show that counsel's representation fell below an objective standard of reasonableness. . . . In *Strickland*, the United States Supreme Court held that [j]udicial scrutiny of counsel's performance must be

highly deferential. It is all too tempting for a [petitioner] to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense, after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. . . . A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the [petitioner] must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. . . . [C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. . . .

"Even if a petitioner shows that counsel's performance was deficient, the second prong, or prejudice prong, requires that the petitioner show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (Citations omitted; internal quotation marks omitted.) *Goodrum* v. *Commissioner of Correction*, 63 Conn. App. 297, 299–301, 776 A.2d 461, cert. denied, 258 Conn. 902, 782 A.2d 136 (2001).

Freeman testified that he spoke with Daniels regarding the shooting. He further stated that he considered calling Daniels as a witness. Freeman ultimately decided that his testimony would not have helped the petitioner and, accordingly, made a tactical decision that was guided by his professional judgment not to call Daniels as a witness.

In its memorandum of decision, the court pointed out that the claim of ineffective assistance of trial counsel must be viewed in light of the fact that the defendant was acquitted of the charge of conspiracy to commit murder. The court reviewed the transcript from the underlying criminal trial. It further stated that Freeman "made a wise and sound tactical decision in not calling [Daniels] to testify on the petitioner's behalf." In addition to pleading guilty to the murder of the victim, Daniels had two prior felony convictions.[2] He received a significant and lengthy prison term on the basis of his plea. Daniels' testimony, assuming that he would have testified at the petitioner's criminal trial in the same manner that he did before the habeas court, could have damaged the petitioner's case before the jury in that his testimony revealed that Daniels likely would have had to remove the twenty-four to thirty-six inch long shotgun from his jacket when he entered the petitioner's motor vehicle. The jury, therefore, may have found that the petitioner was aware of the shotgun and that Daniels planned to use it. Finally, Daniels admitted that he had been approached by the petitioner and asked to provide an exculpatory statement.

The habeas court evaluated all of the testimony before it and determined that the petitioner failed to meet his burden of proving both of the *Strickland* prongs. We agree with that determination. Freeman's decision not to call Daniels as a witness was guided by professional judgment, and was made after a proper investigation and with a thorough understanding of the petitioner's claims and the existing evidence. The decision not to call Daniels as a witness at trial fell into the category of trial strategy or judgment calls that we consistently have declined to second guess. See *Clarke* v. *Commissioner of Correction*, 43 Conn. App. 374, 386,

---

[2] Daniels testified that he had been convicted of larceny in the first degree and robbery in the third degree.

682 A.2d 618 (1996), appeal dismissed, 249 Conn. 350, 732 A.2d 754 (1999); *Davis* v. *Warden*, 32 Conn. App. 296, 305, 629 A.2d 440, cert. denied, 227 Conn. 924, 632 A.2d 701 (1993). We conclude, therefore, that the court properly denied the petition for a writ of habeas corpus on that basis.

## II

The petitioner's second claim is that the court improperly concluded that he received the effective assistance of counsel despite Freeman's failure to request a judicial recommendation against deportation. The state counters by arguing that we lack jurisdiction to hear that part of the appeal because no practical relief can be granted to the petitioner and, therefore, the claim is moot. We find the state's argument persuasive and dismiss that issue as moot.

"Mootness deprives this court of subject matter jurisdiction. . . . [T]he existence of an actual controversy is an essential requisite to appellate jurisdiction; it is not the province of appellate courts to decide moot questions, disconnected from the granting of actual relief or from the determination of which no practical relief can follow. . . . In determining mootness, the dispositive question is whether a successful appeal would benefit the plaintiff or defendant in any way." (Internal quotation marks omitted.) *Mazzacane* v. *Elliott*, 73 Conn. App. 696, 701, 812 A.2d 37 (2002). In this case, the issue of whether Freeman's failure to request a judicial recommendation against deportation constituted ineffective assistance of counsel is moot because even a successful appeal would not have provided the petitioner with any relief.

The following additional facts are necessary for our resolution of that issue. The petitioner is not a citizen of the United States. During the habeas trial, Freeman testified that at the petitioner's sentencing hearing, he

did not request that the court make a recommendation against deportation on the record. Freeman did not believe that "a Superior Court judge has authority as to the [United States Immigration and Naturalization Service (INS)]. I assume a recommendation can be made, but I think the INS makes that determination." He also stated that his major concern was obtaining the minimum sentence for the petitioner rather than the issue of deportation.

This issue requires us to examine the consequences of federal law regarding deportation of a convicted alien. "In general, we look to the federal courts for guidance in resolving issues of federal law. . . . [T]he decisions of the federal circuit in which a state court is located are entitled to great weight in the interpretation of a federal statute." (Internal quotation marks omitted.) *Provident Bank* v. *Lewitt*, 84 Conn. App. 204, 207, 852 A.2d 852, cert. denied, 271 Conn. 924, 859 A.2d 580 (2004).

In *United States* v. *Couto*, 311 F.3d 179 (2d Cir. 2002), the United States Court of Appeals for the Second Circuit summarized the effects of a criminal conviction on a noncitizen in the United States. "[P]rior to 1990, a trial judge had the authority to issue a judicial recommendation against deportation (JRAD) under then 8 U.S.C. § 1251 (b). Such a recommendation was binding on the [United States] Attorney General, and § 1251 (b) therefore gave the judge conclusive authority to decide whether a particular conviction should be disregarded as a basis for deportation. . . . As part of the Immigration Act of 1990, Pub. L. No. 101-649, § 505, 104 Stat. 4978, 5050 (1990), Congress amended former 8 U.S.C. § 1251 (b), to eliminate the safety valve of the JRAD." (Citation omitted; internal quotation marks omitted.) *United States* v. *Couto*, supra, 189. Thus, as a result of the November 29, 1990 enactment of the Immigration Act, "judges . . . were divested of the authority to

issue JRADs . . . ." *United States* v. *Murphey,* 931 F.2d 606, 608–609 (9th Cir. 1991). Furthermore, *"the repealer of § 1251 (b) (2) shall apply to convictions entered before, on, or after the date of the enactment* of the [immigration act]" and is not considered ex post facto legislation. (Emphasis added; internal quotation marks omitted.) *United States* v. *Koziel,* 954 F.2d 831, 833 (2d Cir. 1992).

In *United States* v. *LaPlante,* 57 F.3d 252 (2d Cir. 1995), the defendant, who had entered a guilty plea in 1989, alleged that his trial counsel had been constitutionally ineffective by failing to seek a JRAD. Id., 253. The Second Circuit concluded that due to the retroactive repeal of the court's authority to make a recommendation against deportation, any remand for resentencing would be "pointless." Id.; see also *United States* v. *Murphey,* supra, 931 F.2d 609; *Campbell* v. *United States,* No. 91-CV-2008, 1992 WL 100174 (E.D.N.Y., April 20, 1992).

As we noted, prior to the 1990 immigration act, a "recommendation" against deportation by a sentencing judge was binding on those responsible for the deportation process. *Janvier* v. *United States,* 793 F.2d 449, 452 (2d Cir. 1986). In the present case, the jury convicted the petitioner on November 11, 1989, and the court sentenced him on January 11, 1990. Subsequently, Congress divested sentencing judges of the power to make binding recommendations against deportation when it repealed 8 U.S.C. § 1251 (b) (2). It is well established that this repeal is retroactive in scope. See *United States* v. *Murphey,* supra, 931 F.2d 609. Thus, even if we were to remand the case to the trial court for resentencing, it could not grant the relief that the petitioner seeks, namely, a binding recommendation against deportation, which would amount to nothing but an exercise in futility. Further, it is noted that subsequent amendments have resulted in the "essentially certain, automatic, and

unavoidable" deportation of an alien convicted of a serious felony. *United States* v. *Couto, supra,* 311 F.3d 190. Accordingly, because we cannot grant the petitioner any practical relief, we dismiss this portion of his appeal as moot.

With respect to the first issue raised by the petitioner of ineffective assistance of counsel, we affirm the judgment of the habeas court. The second issue raised by the petitioner is moot.

The judgment is affirmed.

In this opinion the other judges concurred.