Justice Sotomayor,
with whom Justice Ginsburg joins, dissenting.
The Court holds today that Padilla v. Kentucky, 559 U. S. 356 (2010), announced a “new” rule within the meaning of Teague v. Lane, 489 U. S. 288, 301 (1989), and so does not apply to convictions that became final before its announcement. That is wrong, because Padilla did nothing more than apply the existing rule of Strickland v. Washington, 466 U. S. 668 (1984), in a new setting, the same way the Court has done repeatedly in the past: by surveying the relevant professional norms and concluding that they unequivocally required attorneys to provide advice about the immigration consequences of a guilty plea. Because Padilla fell squarely within the metes and bounds established by Strickland, I respectfully dissent.
I
A
The majority correctly sets forth the governing legal principles under Teague and Strickland. Ante, at 347-349. The Teague inquiry turns centrally on the “nature of the rule” in *360 question, and for that reason, “[w]here the beginning point is a rule of . . . general application, ... it will be the infrequent case that yields a result so novel that it forges a new rule.” Wright v. West, 505 U. S. 277, 308-309 (1992) (Kennedy, J., concurring in judgment); see ante, at 347-349. The majority makes the important observation that “when all we do is apply a general standard to the kind of factual circumstances it was meant to address, we will rarely state a new rule.” Ante, at 348. It makes sense, then, that “garden-variety applications of . . . Strickland ... do not produce new rules.” Ibid.
In Strickland, we did not provide a comprehensive definition of deficient performance, and instead held that “[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms.” 466 U. S., at 688. Strickland’s reasonableness prong therefore takes its content from the standards by which lawyers judge their professional obligations, ibid., and those standards are subject to change. That is why, despite the many different settings in which it has been applied, we have never found that an application of Strickland resulted in a new rule.[1]
Significantly, we have previously found that applications of Strickland to new factual scenarios are not barred under 28 U. S. C. § 2254(d)(1) of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). Section 2254(d)(1) precludes habeas relief unless a state-court decision violates “clearly *361 established Federal law,” which, as relevant here, largely overlaps with the inquiry under Teague of whether a decision was “dictated by precedent.” 489 U. S., at 301 (plurality opinion).[2] In Wiggins v. Smith, 539 U. S. 510, 522 (2003), for example, we found that Williams v. Taylor, 529 U. S. 362 (2000), “made no new law” when it held that Strickland extended to an attorney’s responsibility to conduct a background investigation in a capital case. Rather, we explained that “in referring to the ABA Standards for Criminal Justice as guides, \Williams] applied the same ‘clearly established’ precedent of Strickland we apply today.” 539 U. S., at 522. Similarly, in Lafler v. Cooper, 566 U. S. 156, 162-163 (2012), we rejected the argument advanced by the Solicitor General that the Sixth Amendment did not extend to advice about a plea offer because it did not impact the fairness of the trial. Instead, we simply held that Strickland applied to this form of attorney misconduct.
In short, where we merely apply Strickland in a way that corresponds to an evolution in professional norms, we make no new law.
B
Contrary to the majority’s reconstruction, Padilla is built squarely on the foundation laid out by Strickland. Padilla relied upon controlling precedent. It began by reciting the basic rule that “[u]nder Strickland, we first determine whether counsel’s representation ‘fell below an objective standard of reasonableness.’” Padilla, 559 U. S., at 366 (quoting Strickland, 466 U. S., at 688). We recognized that “[t]he first prong—constitutional deficiency—is necessarily linked to the practice and expectations of the legal com *362 munity: ‘The proper measure of attorney performance remains simply reasonableness under prevailing professional norms.’ ” Padilla, 559 U. S., at 366 (quoting Strickland, 466 U. S., at 688).
We therefore examined the substantial changes in federal immigration law that provided the backdrop to the relevant professional standards. Padilla, 559 U. S., at 360-364. Pursuant to the Immigration Act of 1917, 39 Stat. 889-890, a judge could recommend that a defendant who had committed a deportable offense not be removed from the country. Congress entirely eliminated this procedure in 1990. 104 Stat. 5050. Then the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), 110 Stat. 3009-596, abolished the Attorney General’s authority to grant discretionary relief from removal for all but a small number of offenses. Padilla, 559 U. S., at 363. These changes in immigration law meant that for a noncitizen who committed a removable offense, “removal [had become] practically inevitable.” Id., at 364.
In parallel with these developments, the standards of professional responsibility relating to immigration had become more demanding. “For at least the past 15 years,” we observed in Padilla, “professional norms have generally imposed an obligation on counsel to provide advice on the deportation consequences of a client’s plea.” Id., at 372. Citing an array of practice guides and professional responsibility manuals, we noted that “[t]he weight of prevailing professional norms supports the view that counsel must advise her client regarding the risk of deportation.” Id., at 367. Indeed, “authorities of every stripe—including the American Bar Association, criminal defense and public defender organizations, authoritative treatises, and state and city bar publications—universally require defense attorneys to advise as to the risk of deportation consequences for non-citizen clients.” Ibid, (internal quotation marks omitted).
We drew further support for our conclusion that professional standards required advice about deportation conse *363 quences from our decision in INS v. St. Cyr, 533 U. S. 289 (2001). See Padilla, 559 U. S., at 368 (citing St. Cyr, 533 U. S., at 323). In St. Cyr, we had explained that the availability of discretionary relief from removal was critical to a noncitizen’s decision to accept a plea offer, and expected counsel to follow the instructions of “‘numerous practice guides,’ ” such as the ABA’s Standards for Criminal Justice, to inform themselves of the possible immigration consequences of a plea. Padilla, 559 U. S., at 368 (citing St. Cyr, 533 U. S., at 323, n. 50); see id., at 322, n. 48. And we there found that many States already required that a trial judge advise defendants of the same. Ibid. St. Cyr thus “recognized that ‘preserving the client’s right to remain in the United States may be more important to the client than any potential jail sentence.’ ” Padilla, 559 U. S., at 368 (quoting St. Cyr, 533 U. S., at 322).
Our application of Strickland in Padilla followed naturally from these earlier observations about changes in immigration law and the accompanying evolution of professional norms. When we decided St. Cyr and Padilla, nothing about Strickland’s substance or applicability had changed. The only difference from prior law was that the underlying professional norms had changed such that counsel’s failure to give this advice now amounted to constitutionally deficient performance.[3] Both before Padilla and after, counsel was obligated to follow the relevant professional norms. It was only because those norms reflected changes in immigration law that Padilla reached the result it did, not because the Sixth Amendment right had changed at all.
*364 I—i hH
A
Accepting that routine applications of Strickland do not result in new rules, the majority nevertheless holds that Padilla went a step further. In its view, Padilla “ ‘br[oke] new ground’ ” by addressing the threshold question whether advice about deportation is a collateral consequence of a criminal conviction that falls within the scope of the Sixth Amendment. Ante, at 353-354. But that is wrong, because Padilla declined to embrace the very distinction between collateral and direct consequences of a criminal conviction that the majority says it did. In fact, the Court stated very clearly that it found the distinction irrelevant for the purposes of determining a defense lawyer’s obligation to provide advice about the immigration consequences of a plea. 559 U. S., at 364-365, n. 8. We asserted that we had “never applied a distinction between direct and collateral consequences to define the scope of constitutionally ‘reasonable professional assistance’ required under Strickland,” and concluded that “[wjhether that distinction is appropriate is a question we need not consider in this case.” Id., at 365 (emphasis added). The distinction was “ill suited” to the task at hand, we explained, because deportation has a “close connection to the criminal process,” and is “uniquely difficult to classify as either a direct or a collateral consequence.” Id., at 366. Indeed, “[o]ur law ha[d] enmeshed criminal convictions and the penalty of deportation for nearly a century,” and we had “long recognized” that deportation is “particularly severe.” Id., at 365.[4]
*365 At bottom, then, the majority’s argument hinges upon a distinction the Court has never embraced and that Padilla found irrelevant to the issue it ultimately decided. Without this revision to our recent decisional history, the majority’s analysis unravels.
B
The majority finds that the “legal landscape,” Graham v. Collins, 506 U. S. 461, 468 (1993), before Padilla was nearly uniform in its rejection of Strickland’s application to the deportation consequences of a plea. Ante, at 350-354. It concludes that the lower courts were generally in agreement that the Sixth Amendment did not require attorneys to inform clients of the collateral consequences of a plea, and that this weighs heavily in favor of finding that Padilla announced a new rule. Ante, at 350-351, nn. 7, 8. But the majority’s discussion of these precedents operates at too high a level of generality and fails to account for the development of professional standards over time. St. Cyr noted the importance of advising clients about immigration consequences was of recent vintage, indeed more recent than some of the cases the majority cites. See 533 U. S., at 322-323. The Court relies upon decisions issued over a period that spans more than 30 years. See ante, at 350-351, nn. 7, 8. Nearly half of them (17) were decided before the enactment of IIRIRA. See ibid. And all but two of the Federal Court of Appeals cases were decided before St. Cyr. See ante, at 350-351, nn. 7,8. These earlier decisions show nothing more than that the underlying professional norms had not yet *366 evolved to require attorneys to provide advice about deportation consequences.
Cases from the period following IIRIRA and St Cyr undermine the majority's generalizations about the state of the law before Padilla. Deportation had long been understood by lower courts to present “the most difficult” penalty to classify as either a collateral or direct consequence. United States v. Russell, 686 F. 2d 35, 38 (CADC 1982); cf. Janvier v. United States, 793 F. 2d 449, 455 (CA2 1986) (holding that Strickland applied to advice about a judicial recommendation against deportation). Eventually, and in parallel with changes in federal immigration law and the corresponding professional norms, the lower courts had acknowledged an important qualification to the collateral-consequences rule. After the passage of IIRIRA and this Court's decision in St. Cyr, many courts concluded that a lawyer’s affirmative misstatements about the immigration consequences of a guilty plea can constitute deficient performance under Strickland. Indeed, each Federal Court of Appeals to address the question after St. Cyr so held. See United States v. Couto, 311 F. 3d 179, 188 (CA2 2002); United States v. Kwan, 407 F. 3d 1005, 1015 (CA9 2005); cf. Downs-Morgan v. United States, 765 F. 2d 1534, 1540-1541 (CA11 1985).[5] State-court decisions from this period were in accord and relied upon similar reasoning.[6]
*367 These decisions created an important exception to the collateral/direct consequences distinction. They also foreshadowed the Court’s reasoning in Padilla by basing their analysis of the relevant professional norms on the special nature of deportation, the ABA standards governing immigration practice, and the Court’s assessment of those standards in St. Cyr. See Kwan, 407 F. 3d, at 1016 (“That counsel may have misled [the defendant] out of ignorance is no excuse. It is a basic rule of professional conduct that a lawyer must ... [remain] abreast of changes in the law and its practice_ Counsel’s performance . . . fell below the [ABA]’s ethical standard for criminal defense attorneys with respect to immigration consequences. The Supreme Court noted this standard in [St. Cyr]”)) Couto, 311 F. 3d, at 187-191 (citing St. Cyr and the relevant ABA standards, and concluding that “recent Supreme Court authority supports [a] broader view of attorney responsibility” that encompasses affirmative misrepresentations about deportation consequences); see also Downs-Morgan, 765 F. 2d, at 1541 (“[D]eportation and exclusion [are] harsh consequences”).
The majority believes that these decisions did not meaningfully alter the state of the law in the lower courts before Padilla, because they merely applied the age-old principle that a lawyer may not affirmatively mislead a client. Ante, at 355-356. But, as explained, the reasoning of these cases renders that characterization at best incomplete. See, e. g., Kwan, 407 F. 3d, at 1016. While these lower court precedents are consistent with the general principle that attorneys should not mislead clients by providing incorrect advice, they did not rest primarily on that rule. Rather, they recognized the significant changes in professional norms that predated Padilla and that we had noted in St. Cyr. As a *368 consequence, the “wall between direct and collateral consequences” that the lower courts had erected, ante, at 352-353, had already been dealt a serious blow by the time the Court decided Padilla.
As the majority points out, these misrepresentation cases stopped short of imposing an affirmative obligation on lawyers to consult with clients about the consequences of deportation. Ante, at 356. But the majority places .too much emphasis on the absence of lower court authority finding that an attorney’s omissions with respect to deportation resulted in ineffective assistance. The distinction between omissions and affirmative misrepresentations on which these lower court cases depended cannot be reconciled with Strickland. In Padilla itself, we rejected the Solicitor General’s suggestion that Strickland should apply to advice about the immigration consequences of a plea only in eases where defense counsel makes an affirmative misstatement. Padilla, 559 U. S., at 369-370. We did so because we found that Strickland was incompatible with the distinction between an obligation to give advice and a prohibition on affirmative misstatements. 559 U. S., at 370 (citing Strickland, 466 U. S., at 690). Strickland made clear that its standard of attorney performance applied to both “acts” and “omissions,” and that a rule limiting the performance inquiry to one or the other was too narrow. 466 U. S., at 690. Thus, the distinction between misrepresentations and omissions, on which the majority relies in classifying lower court precedent, implies a categorical rule that is inconsistent with Strickland’s requirement of a case-by-case assessment of an attorney’s performance.[7] Id., at 688-689; see, e. g., Roe v. Flores-Ortega, *369 528 U. S. 470, 479 (2000). In short, that some courts have differentiated between misleading by silence and affirmative misrepresentation hardly establishes the rationality of the distinction. Notably, the Court offers no reasoned basis for believing that such a distinction can be extracted from Strickland.
To be sure, lower courts did continue to apply the distinction between collateral and direct consequences after St. Cyr. See ante, at 356-358; see, e. g., Broomes v. Ashcroft, 358 F. 3d 1251, 1256-1257 (CA10 2004). Even so, and even assuming the misrepresentation cases did not call the distinction into question, the existence of these lower court decisions is not dispositive. “[T]he standard for determining when a case establishes a new rule is ‘objective,’ and the mere existence of conflicting authority does not necessarily mean a rule is new.” Wright, 505 U. S., at 304 (O’Connor, J., concurring in judgment) (citing Stringer v. Black, 503 U. S. 222, 237 (1992)); see Graham v. Collins, 506 U. S. 461, 506 (1993) (Souter, J., dissenting).
Where the application of Strickland was straightforward, rooted in 15 years of professional standards and the Court’s prior St. Cyr decision, there is no reason to put these lower court cases, many from more than a decade earlier, ahead of this Court’s simple and clear reasoning in Padilla. Nevertheless, the majority reaches the paradoxical conclusion that by declining to apply a collateral-consequence doctrine the Court had never adopted, Padilla announced a new rule.
HH H-<
What truly appears to drive the majority’s analysis is its sense that Padilla occasioned a serious disruption in lower court decisional reasoning. See, e. g., ante, at 353 (“If that *370 does not count as ‘breaking] new ground’ ... we are hard pressed to know what would” (quoting Teague, 489 U. S., at 301)). The concurring and dissenting opinions in Padilla similarly reflected the impression that it was a significant and destabilizing decision. See 559 U. S., at 377 (Alito, J., concurring in judgment); id., at 392 (Scalia, J., dissenting) (describing the majority opinion as a “sledge hammer”); ante, at 352, n. 10. But the fact that a decision was perceived as momentous or consequential, particularly by those who disagreed with it, does not control in the Teague analysis. Faithfully applying the Teague rule depends instead on an examination of this Court’s reasoning and an objective assessment of the precedent at issue. Stringer, 503 U. S., at 237. In Padilla, we did nothing more than apply Strickland. By holding to the contrary, today’s decision deprives defendants of the fundamental protection of Strickland, which requires that lawyers comply with professional norms with respect to any advice they provide to clients.
* * *
Accordingly, I would reverse the judgment of the Seventh Circuit and hold that Padilla applies retroactively on collateral review to convictions that became final before its announcement. With respect, I dissent.

 See, e. g., Lafler v. Cooper, 566 U. S. 156, 170-172 (2012) (incorrect advice leading to a plea offer’s rejection); Rompilla v. Beard, 545 U. S. 374 (2005) (failure to investigate evidence the prosecution intended to use to prove an aggravating circumstance in a capital ease); Wiggins v. Smith, 539 U. S. 510 (2003) (failure to investigate a defendant’s social history in a capital case); Roe v. Flores-Ortega, 528 U. S. 470 (2000) (failure to consult with a defendant regarding whether to pursue an appeal); Williams v. Taylor, 529 U. S. 362, 391 (2000) (failure to investigate a defendant's background for the purposes of mitigation evidence in a capital case); Hill v. Lockhart, 474 U. S. 52 (1985) (failure to provide effective assistance during plea negotiations).

 AEDPA of course differs from the Teague rule in other important respects. See, e. g., Greene v. Fisher, 565 U. S. 34, 39 (2011). But these differences aside, the fact that we have repeatedly found AEDPA eases involving Strickland to be controlled by established precedent underscores that the application of Strickland in a new context should almost never result in a new rule.

 Even before IIRIRA and St. Cyr, lawyers of course understood that it was good practice to inform clients of the deportation consequences of a plea. See ante, at 357, n. 15 (citing 3 ABA Project on Standards for Criminal Justice, Standards Relating to Pleas of Guilty § 3.2(b), Commentary, p. 71 (App. Draft' 1968)). Following the sea change in immigration law, however, the professional norms had become so established and universally recognized that the measure of constitutionally adequate performance now included giving such advice in the form Padilla recognized. See 559 U. S., at 367-368.

 See, e. g., INS v. St. Cyr, 533 U. S. 289, 322 (2001) (noting that “[p]reserving the client’s right to remain in the United States may be more important... than any potential jail sentence” (internal quotation marks omitted)); Jordan v. De George, 341 U. S. 223, 243 (1951) (Jackson, J., dissenting) (deportation proceedings “practically . . . are [criminal] for they extend the criminal process of sentencing to include on the same convictions an additional punishment”); Fong Haw Tan v. Phelan, 333 U. S. 6, 10 *365 (1948) (“[D]eportation is a drastic measure and at times the equivalent of banishment or exile”); Ng Fung Ho v. White, 259 U. S. 276, 284 (1922) (deportation may result in “loss of both property and life; or of all that makes life worth living”); Fong Yue Ting v. United States, 149 U. S. 698, 740 (1893) (Brewer, J., dissenting) (“Every one knows that to be forcibly taken away from home, and family, and friends, and business, and property, and sent across the ocean to a distant land, is punishment; and that oftentimes most severe and cruel”).

 See United States v. Mora-Gomez, 875 F. Supp. 1208, 1212 (ED Va. 1995) (“[T]he clear consensus is that an affirmative misstatement regarding deportation may constitute ineffective assistance”).

 See Rubio v. State, 124 Nev. 1032, 1041, 194 P. 3d 1224, 1230 (2008) (per curiam) (“Like other jurisdictions, we recognize the particularly harsh and penal nature of deportation. The Supreme Court of the United States has described deportation as 'a drastic measure and at times the equivalent of banishment or exile’ and further depicted it as ‘a penalty.’... Perhaps understanding the harshness of deportation, a growing number of jurisdictions have adopted the affirmative misrepresentation exception to the collateral consequence rule”); People v. Correa, 108 Ill. 2d 541, 550-552, 485 N. E. 2d 307, 311 (1985); People v. McDonald, 1 N. Y. 3d 109, 113- *367 115, 802 N. E. 2d 131, 134-135 (2003); see also Alguno v. State, 892 So. 2d 1200, 1201 (Fla. App. 2005) (per curiam); State v. Rojas-Martinez, 2005 UT 86, ¶¶ 15-20, 125 P. 3d 930, 933-935; In re Yim, 139 Wash. 2d 581, 588, 989 P. 2d 512, 516 (1999).

 The majority cites a law review article for the proposition that the categorical consequences rule is “one of 'the most widely recognized rules of American law. ’ ” Ante, at 351 (quoting Chin & Holmes, Effective Assistance of Counsel and the Consequences of Guilty Pleas, 87 Cornell L. Rev. 697, 706 (2002)). But the article was, in fact, quite critical of the rule. The authors explained that “[t]he real work of the conviction is performed *369 by the collateral consequences,” and that the direct/collateral distinction in the context of ineffective-assistance claims was “surprising because it seems inconsistent with the framework that the Supreme Court . . . laid out” in Strickland. Chin <& Holmes, 87 Cornell L. Rev., at 700-701.